FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIELA PRODANOVA, Individually
and on behalf of all others similarly
situated,

*Plaintiff*,

and

PANTHERA INVESTMENT FUND L.P.,
Lead Plaintiff, Individually and on
behalf of all others similarly situated,
*Plaintiff-Appellant*,

v.

H.C. WAINWRIGHT & CO., LLC;
MARK VIKLUND; EDWARD D.
SILVERA; OREN LIVNAT,
*Defendants-Appellees.*

No. 19-56048

D.C. No.
2:17-cv-07926-
JAK-AS

OPINION

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted February 2, 2021
Pasadena, California

Filed April 8, 2021

Before:  Ronald M. Gould, Kenneth K. Lee, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Lee

## SUMMARY[*]

### Securities Fraud

Affirming the district court's dismissal of a securities fraud action against an investment bank, the panel held that the complaint failed sufficiently to allege scienter.

The panel held that because the complaint did not offer a plausible motive for the bank's actions or provide compelling and particularized allegations about scienter, it did not support the required strong inference that the defendant intentionally made false or misleading statements or acted with deliberate recklessness.

### COUNSEL

Ira M. Press (argued) Peter S. Linden, and Angela M. Farren, Kirby McInerney LLP, New York, New York; Lionel Z. Glancy and Robert V. Prongay, Glancy Prongay & Murray LLP, Los Angeles, California; James R. Swanson, Jason W. Burge, and Kathryn J. Johnson, Fishman Haygood LLP, New Orleans, Louisiana; for Plaintiff-Appellant.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Jay S. Auslander (argued) and Adam Itzkowitz, Wilk Auslander LLP, New York, New York; Paul B. Salvaty and Jordan D. Teti, Hogan Lovells US LLP, Los Angeles, California; for Defendants-Appellees.

**OPINION**

LEE, Circuit Judge:

As its name suggests, a securities *fraud* lawsuit requires a showing of an intent to defraud investors. Mere negligence — even head-scratching mistakes — does not amount to fraud. So if the complaint fails to plead a plausible motive for the allegedly fraudulent action, the plaintiff will face a substantial hurdle in establishing scienter.

That is the case here. An investment bank analyst published a report setting a target price of $7 per share for a company's stock. That company's stock surged 26% that day. But later that evening, the same investment bank announced that it would act as the placing agent for a dilutive offering that priced that same stock at $6 per share. The stock price, not surprisingly, declined the next day. A securities fraud class action lawsuit against the investment bank soon followed. The complaint alleged that the bank fraudulently sought to inflate the price of the company's stock price. But the plaintiff has not articulated with particularity or plausibility the bank's motive for doing so. If anything, the bank's actions tarnished its reputation and likely frayed its relationship with its client.

Because the complaint does not offer a plausible motive for the bank's actions or provide compelling and particularized allegations about scienter, it does not support a strong inference that the defendant intentionally made false

or misleading statements or acted with deliberate recklessness.  *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016).  We thus affirm the district court's dismissal of the complaint.

## BACKGROUND[1]

Defendant H.C. Wainwright & Co. ("HCW"), a specialty investment bank, focuses on capital markets and equity research in the life sciences and biotechnology industries. Under Financial Industry Regulatory Authority ("FINRA") regulations, HCW separates its investment banking and research departments through "information barriers . . . reasonably designed to ensure that research analysts are insulated from the review, pressure or oversight by persons engaged in investment banking services activities."  FINRA R. 2241(b)(2).  It also maintains a compliance department to "identify and effectively manage conflicts of interest" between the research and investment banking groups. FINRA R. 2241(b)(1).

HCW has had a longstanding business relationship with MannKind Corporation, a small but publicly traded biopharmaceuticals company.  MannKind develops and markets inhaled therapeutic products for various diseases. Its first and only FDA-approved drug, Afrezza, is a rapid-acting inhaled insulin used for adults with Type 1 and Type 2 diabetes.

On October 2, 2017, before trading opened, MannKind announced that the FDA had approved a favorable labeling

---

[1] We accept the factual allegations in the Second Amended Complaint as true and construe them in the light most favorable to the plaintiff.  *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020).

change for Afrezza. Over the next three days, MannKind's stock price jumped from $2.17 to $4.96 — an increase of 128%. Its trading volume also increased more than 2,000%.

About a week later, on October 10, 2017 at 4:03 AM Pacific Time, an investment analyst at HCW published a report called *A Breath of New Life with Afrezza Turnaround Story: Initiate with Buy and $7 Target* ("the Report"). The Report explained that based on MannKind's publicly available cash flow and debt data, it expected "near-term recapitalization and dilution." The Report then set a $7 buy target for MannKind shares. The Report also included a disclaimer[2] stating that HCW "will seek compensation from the companies mentioned in this report for investment banking services within three months following publication of the research report."

The day HCW published the Report, MannKind's stock price spiked up 26% to a closing price of $6.71[3] with a trading volume of 48.23 million shares. Later that night at 9:02 PM Pacific Time, MannKind announced a registered direct offering of 10,166,600 shares of common stock at $6 per share ("the Offering"). In its announcement, MannKind also revealed that HCW would serve as the exclusive placement agent for the Offering. The Placement Agency Agreement — signed on the same day as the Report's

---

[2] In research reports, FINRA members must disclose if they "expect[] to receive or intend[] to seek compensation for investment banking services from the subject company in the next three months." FINRA R. 2241(c)(4)(C)(iii).

[3] This increase, however, was smaller than the 146% increase in share price that had occurred between September 29, 2017 (the last trading day before the FDA approval announcement) and October 9, 2017 (the day before the Report was published).

publication — stated that HCW would receive a cash fee equal to 5% of the Offering's aggregate gross proceeds.

The very next day, MannKind's stock price — not surprisingly — declined 18% to a closing price of $5.47 with a trading volume of 33.6 million shares. As the plaintiff points out, investors who immediately bought MannKind shares after HCW issued its $7 target price may have felt blindsided when that same bank participated in a dilutive offering setting the stock price at $6. After that, the stock price remained steady for about a week and traded about 71 million shares. At the end of that week, MannKind's stock price was still higher than it had been on the day before the Report's publication.

Based on these events, Daniela Prodanova, an individual investor, filed a putative securities class action lawsuit. The putative class includes "all other persons or entities that purchased MannKind securities between 4:03 AM Pacific Time on October 10, 2017 (7:03 AM Eastern Time) and 9:02 PM Pacific Time on October 10, 2017 (12:02 AM Eastern Time on October 11, 2017)." Under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, the district court designated Panthera Investment Fund L.P. as the lead plaintiff.

Panthera filed the First Amended Complaint ("FAC"), alleging that HCW, its Chief Executive Officer Mark Viklund, and the Report's author Oren Livnat fraudulently sought to inflate the price of MannKind shares before the Offering by issuing the Report. The FAC specifically alleged that the defendants had violated Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. It also asserted a claim against Viklund for control person

liability in violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t-1(a).

The defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the FAC failed to allege falsity, scienter, and loss causation.  The district court granted this motion without prejudice.  It held that the FAC had satisfied the pleading requirements for falsity but had not adequately alleged scienter.

Panthera's Second Amendment Complaint ("SAC") fared no better.  Beyond naming HCW's Chief Operating Officer Edward D. Silvera as an additional defendant, it largely repeated the same allegations as the FAC.  But Panthera did try to bolster its scienter allegations by adding evidence from two witnesses — an industry expert named Larry Kimmel and a confidential witness ("CW") who previously worked in HCW's research department.

Kimmel provided evidence on industry custom — that investment banks generally maintain compliance departments that have visibility into both the research and investment banking groups to check for conflicts of interest.  The compliance department typically learns of prospective banking engagements and places those clients on a "watch list."  Then, when an analyst prepares a research report, compliance checks to ensure that the watch list does not include the report's subject company.  Kimmel had never worked with HCW, but he stated that if HCW followed industry standards, then HCW's watch list should have included MannKind, and the compliance department should have discovered a conflict when it received the Report for review.

The CW worked in HCW's research department from November 2016 to August 2017.  His employment with

HCW thus ended before any of the events here took place. The CW provided evidence that HCW's compliance department generally follows industry standards for checking conflicts of interest. But the CW could not provide any specific information about how HCW approved the Report for publication.

The defendants filed another motion to dismiss, asserting that the SAC failed to adequately plead scienter and loss causation. The district court granted the motion to dismiss with prejudice as to Livnat and without prejudice as to the remaining defendants. It again held that Panthera had not adequately alleged scienter, so it did not reach the issue of loss causation. When Panthera chose not to further amend its complaint, the district court entered final judgment dismissing the case with prejudice. This appeal followed, and we have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

"We review de novo the district court's dismissal of plaintiff's complaint for failure to state a claim under Rule 12(b)(6)." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 (9th Cir. 2002). Our review includes the face of the complaint, all materials incorporated into the complaint by reference, and evidence properly subject to judicial notice. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

## ANALYSIS

## I.  Legal Standards

Section 10(b) of the Exchange Act makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Under this statute, the SEC promulgated Rule 10b-5, which declares it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 20(a) of the Exchange Act also makes "controlling person[s]" liable for violating Section 10(b) and Rule 10b-5.  15 U.S.C. § 78t(a).

To state a claim under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter;

(3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citations omitted).  And a complaint stating such claims "must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Zucco Partners*, 552 F.3d at 990.

Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud."  In other words, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (cleaned up).  As relevant here, the PSLRA extended Rule 9(b)'s particularity requirement to allegations of scienter.  Thus, to adequately plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

## II. The SAC's Allegations Do Not Support a Strong Inference of Scienter.

To support a "strong inference" of scienter under the PSLRA, a complaint must allege that the defendant made false or misleading statements with an "intent to deceive, manipulate, or defraud," or with deliberate recklessness. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (citation omitted).  Deliberate recklessness is not "*mere* recklessness." *Schueneman*, 840 F.3d at 705 (citation omitted).  Instead, it is "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the

defendant or is so *obvious* that the actor must have been aware of it." *Id.* (citation omitted).

The "strong inference" standard "present[s] no small hurdle for the securities fraud plaintiff." *Id.* (citation omitted). A reviewing court must "engage in a comparative evaluation [and] . . . consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. We now consider whether the SAC meets this high burden.

**A. The SAC Did Not Plead a Plausible Theory of the Defendants' Motive.**

Panthera maintains that HCW deliberately published the Report without disclosing the impending Offering to drive up MannKind's stock price. HCW's alleged motive was to increase its own compensation from the Offering, as it was set to receive 5% of the Offering's gross proceeds. Panthera appears to assert two formulations of this motive, but neither theory is plausible. And "[a]llegations that are implausible do not create a strong inference of scienter." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020).

Panthera's first theory alleges that HCW had an incentive to boost MannKind's stock price on October 10 — the day the Offering was announced — because HCW's overall compensation from the Offering would somehow increase if the stock price were higher. The second theory similarly asserts that HCW had an interest in "generat[ing] buying activity at an artificially inflated price to ensure a

profitable offering."   Because there was no predetermined minimum number of shares to be sold in the Offering, HCW had an incentive to generate interest in MannKind stock so that as many shares as possible would be sold.  By publishing the Report, HCW could generate such interest, increasing MannKind's stock price and trading volume.  This would maximize the Offering's profitability, leading to greater compensation for HCW.

Neither theory is persuasive or plausible, as both are divorced from common experience.  *See Nguyen*, 962 F.3d at 415 ("[T]he PSLRA neither allows nor requires us to check our disbelief at the door.").  Generally, we expect that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information.  *See, e.g.*, *Zucco Partners*, 552 F.3d at 1004. But here, neither theory provides a clear financial incentive.

Panthera's first theory does not make sense for a couple of reasons.

First, MannKind raised almost $61 million in the Offering, so HCW earned a little over $3 million (*i.e.*, 5% of the $61 million gross proceeds from the Offering).  But Panthera does not explain how the share price would affect the Offering's gross proceeds, which in turn determine HCW's compensation.  Put another way, HCW would have received the same compensation for a $61 million Offering, no matter if the share price was $6 or $7.

Second, HCW would stand to lose more from its allegedly fraudulent actions than it would gain.  HCW's apparent snafu — issuing a $7 target price in a Report just before a dilutive offering of $6 per share — likely strained

its longstanding relationship with MannKind.  The risk of losing a longtime client and publicly sullying its own reputation in the industry far outweighs the benefit of a slightly higher return on one transaction.  Indeed, the only plausible explanation for HCW's action is that someone there pulled a Bill Buckner and somehow let a glaring conflict pass by.  Its conduct is more like an embarrassing Red Sox error than an elaborate Black Sox fraud.  Simply put, a company's apparent error — even an embarrassing or inexplicable one — does not establish fraudulent intent, especially if the plaintiff cannot offer a plausible motive for the company's conduct.  Panthera thus does not plausibly allege scienter on this theory.  *See Nguyen*, 962 F.3d at 415.

Panthera's second theory is even more speculative.  The SAC alleges no facts to show that the Offering would not have sold out but for the Report's publication and the later increase in MannKind's share price and trading volume.  Especially considering the substantial increase in share price and trading volume following the FDA approval announcement, it strains plausibility that HCW believed it needed to publish the Report to ensure a sold-out Offering.

It is true that a complaint lacking a plausible motive allegation may still meet its burden of pleading a strong inference of scienter.  *See Tellabs*, 551 U.S. at 325.  But the lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of scienter.  Only where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness will we overlook the failure to allege a plausible motive.  *See id*; *Nguyen*, 962 F.3d at 415.  With this in mind, we now turn to the SAC's remaining factual allegations.

**B. The SAC Did Not Adequately Allege Facts with Particularity to Support a Strong Inference of Scienter for Any of the Defendants.**

To meet the PSLRA's high burden for pleading scienter, a complaint cannot rely on "mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (cleaned up). And because "a corporation can only act through its employees and agents," it can "only have scienter through them." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015) (cleaned up). Panthera asserts that HCW acted with scienter based on the intent or deliberate recklessness of the individual defendants — Livnat, Viklund, and Silvera — and that of its compliance department. But as we explain below, the SAC does not allege with sufficient particularity that any of those parties acted with scienter that could be imputed to HCW.

**i. The SAC Fails to Sufficiently Plead That Any Individual Defendant Acted with Scienter.**

We first consider the plaintiff's claim against Livnat, the Report's author. As the district court dismissed this claim without leave to amend, we review for abuse of discretion.[4] *See Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002).

---

[4] The claims against the remaining defendants were dismissed with leave to amend, so de novo review still applies. *See Lipton*, 284 F.3d at 1035.

The SAC pleads no facts alleging that Livnat knew about the Offering when he authored the Report.  There is thus no factual basis for the allegation that he acted with knowledge or deliberate recklessness.  *See Glazer*, 549 F.3d at 745 (stating that a complaint must "plead scienter with respect to those individuals who actually made the false statements").  The SAC also acknowledges that HCW follows FINRA regulations that require separating its research and investment banking groups.  This underscores the conclusion that Livnat, a research analyst, remained walled off from the investment banking department and did not know about the Offering when he published the Report.  Without factual allegations to the contrary, the SAC has not alleged with particularity — or even alleged at all — that Livnat acted with scienter.  The district court did not abuse its discretion in dismissing this claim without leave to amend.

We next turn to the claims against Viklund, the bank's CEO.  The SAC asserts that, as the "primary contact" for the research and investment banking groups, he "knew (1) the price target that was set forth in the Report; (2) the formula for pricing the offering; (3) the Report's vague reference to a deal between MannKind and [HCW] over the next three months; (4) the Report's expectation of 'near-term recapitalization'; and (5) the timing of the Offering, and of MannKind's public announcement of the Offering."  These generalized allegations fail to show that Viklund had direct involvement in writing or publishing the Report.  "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter — at least absent some additional allegation of specific information conveyed to management and related to the fraud."  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008).

Viklund's status as a "primary contact" does not strengthen the SAC's scienter allegations.  The SAC fails to explain what a "primary contact" is, or how Viklund's position establishes that he had detailed and contemporaneous knowledge of both the Report and the Offering.  For Viklund to have made a false statement with intent or deliberate recklessness, he would have needed to know about the Offering when the Report was published and had control over the Report's publication.  *See Glazer*, 549 F.3d at 745.  As the SAC offers no particularized facts, it has not adequately pled scienter in this context.

In a similar fashion, the SAC alleges that "Viklund possessed the power and authority to control the policies and procedures of [HCW's] Compliance Department to ensure that they did not allow research reports to be published in blatant violation of industry custom and practice."  That he generally had such authority, however, does not establish that he was involved with *this* Report.  As the SAC fails to present facts establishing his involvement with the compliance department's review of the Report, we cannot infer that he knew about it.  *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard.").  The complaint thus does not support a strong inference of scienter for Viklund.

Finally, we conclude that the SAC does not adequately plead that Silvera, the COO, had scienter.  Where the plaintiff asserts the same allegations of scienter for Silvera as it does for Viklund, those claims are insufficient for the same reasons discussed above.  And the SAC's remaining

allegations fail to provide particularized facts showing that Silvera acted with intent or deliberate recklessness.

The SAC's assertion that "[c]ompliance personnel reported to Silvera as COO," does not provide any particularized facts supporting an inference of scienter, *see Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (holding that defendants' hands-on management style supported an inference of scienter when coupled with their admissions that they closely monitored the data and information that they misrepresented in the alleged false statements). Panthera has offered no information on whether compliance personnel reported to Silvera about the details of the Report or whether he was directly involved with the Report at all. Nor does the SAC include admissions by Silvera that he closely monitored any information that in the Report.

Panthera's final allegation that "[a]s COO, Silvera drafted, negotiated, and executed the Placement Agency Agreement," similarly lacks facts reflecting intentional or deliberately reckless conduct. Even accepting the allegation as true,[5] it cannot support a strong inference of scienter. Silvera may have had a role in negotiating the Offering and known about it before the Report's publication. But without particularized allegations showing that he was directly involved with the Report and ignored its falsity, there is not enough factual support for a plausible inference of scienter. *See Glazer*, 549 F.3d at 745.

---

[5] HCW argues that there are no facts showing that Silvera drafted the agreement. All the record shows is that Silvera signed the agreement.

### ii.  The SAC Fails to Adequately Plead That the Compliance Department Acted with Scienter.

Panthera argues that, even if no individual defendant acted with scienter, someone in HCW's compliance department must have approved the Report despite knowing about the Offering.  The SAC asserts that the compliance department had scienter that can be imputed to HCW.  *See ChinaCast*, 809 F.3d at 475.  The SAC alleges this based mainly on two witness declarations from Kimmel and the CW, along with the Report's inclusion of a disclaimer.  But, like its allegations for the individual defendants, the SAC has not pled particularized facts showing that the compliance department knew about the Offering when it approved the Report.

Witness declarations can support an inference of scienter, but to do so, they must provide specific facts showing a connection between the false statement and the mindset of the person who made it.  *See Zucco Partners*, 552 F.3d at 996; *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (explaining that witness declarations must include "allegations linking specific reports and their contents to the [defendants], not to mention the link between the witnesses and the" defendants).

Neither Kimmel nor the CW could link a member of the compliance department with the Report or knowledge of the Offering.  Instead, Kimmel only offered evidence of standard industry practices, which standing alone remains insufficient.  While industry custom may include maintaining a "watch list" of pending transactions and checking that list for conflicts before publishing reports, that does not support an inference that someone in HCW's compliance department acted with scienter in approving the

Report.  The complaint contains no factual allegations that the watch list included the Offering, that a compliance officer checked the list and realized the conflict, and then that same officer approved the Report knowing that a conflict existed.  In absence of such allegations, the SAC does not adequately plead facts supporting a strong inference of scienter.

The CW's declaration fails to remedy this problem, as it only confirms that HCW generally adheres to industry standards, not that it intentionally (as opposed to merely inadvertently) failed to follow those standards for *this* Report.  The CW could not have provided more specific information, as he left his employment at HCW before any of the events at issue took place.  *See Zucco Partners*, 552 F.3d at 996 (explaining that witness declarations did not support an inference of scienter because the witnesses "were not employed by [defendant corporation] during the time period in question and have only secondhand information").  Thus, all the CW's declaration can tell us is that HCW had industry-standard procedures in place.  That fact does not provide a basis for inferring culpable conduct for the Report.[6]

In a final attempt to allege that someone in the compliance department acted with scienter, Panthera points to a FINRA disclaimer in the Report.  The SAC asserts that

---

[6] Panthera asserts that *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506 (9th Cir. 2016) provides a scenario where similar circumstantial evidence was used to support a strong inference of scienter.  But our memorandum disposition did not address scienter, *see id.* at 507, and the district court's decision that did address scienter relied on particularized factual allegations that are not analogous to those presented here, *see In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2017 WL 1549485 at *6–7 (N.D. Cal. May 1, 2017).

the inclusion of the language HCW "will seek compensation from the companies mentioned in this report for investment banking services within three months following publication of the research report," suggests that a compliance officer knew of the Offering when he or she approved the Report. But the SAC does not allege that a compliance officer inserted the disclaimer, nor does it assert that anyone other than Livnat contributed to the Report.[7]  The CW's declaration also does not state that the compliance department adds FINRA disclaimers to reports.  Thus, the SAC has not provided a factual basis for concluding that anyone in the compliance department knew about the Offering and added the disclaimer in response.

Further, the disclaimer language is essentially identical to that in FINRA R. 2241(c)(4)(C)(iii).  This suggests that it is boilerplate language HCW generally includes in its reports.  *See Zucco Partners*, 552 F.3d at 1003–04 (stating that "[b]oilerplate language" required by a regulation or statute "add[s] nothing substantial to the scienter calculus").  And considering HCW's longtime relationship with MannKind, HCW may have included the language simply because HCW regularly does business with MannKind, not because someone knew the Offering was imminent.  The disclaimer also referred to "the companies mentioned in this report," not just MannKind.  Since there were two companies mentioned in the Report, the disclaimer applied to both.  This undercuts the theory that someone inserted it based on knowledge of the Offering.  As the SAC does not allege facts to counter these more plausible innocent

---

[7] Panthera now argues that someone else wrote the disclaimer, but that allegation was not in the SAC or presented to the district court.  We thus cannot consider it.  *See In re Heritage Bond Litig.*, 546 F.3d 667, 681 n.16 (9th Cir. 2008).

explanations, the disclaimer does not support an inference of scienter.  *See Tellabs*, 551 U.S. at 324.

### iii.  The SAC Cannot Rely on the Core Operations Theory to Support an Inference of Scienter.

We next consider the plaintiff's allegations based on the core operations theory, which presumes that "corporate officers have knowledge of the critical core operation of their companies."  *Intuitive Surgical*, 759 F.3d at 1062 (citation omitted).

There are three circumstances under which core operations allegations can support a strong inference of scienter: (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the "rare circumstances" when they are not particularized, but "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."  *Id.* (quoting *S. Ferry*, 542 F.3d at 785–86).  Plaintiffs face a high burden of proof, as they must provide either specific admissions by the executives that they were involved in the details of a company's operations or witness statements that the executives were specifically involved in producing the false reports.  *See id.*

The SAC does not plead particularized facts sufficient to support the first two formulations of the core operations theory.  As detailed above, no HCW executives admitted any involvement with the minutiae of the compliance or research groups.  The only witness statements are those of Kimmel and the CW, neither of whom asserts that any HCW executive personally worked on or approved the Report.  Rather, all the SAC alleges is that, because of their positions

in the company and their supervisory authority over the compliance department, Silvera or Viklund "would have" been involved in creating and publishing the Report. This conclusory allegation, without more, is insufficient.

This is also not a case in which the third formulation of the core operations theory applies. The conflict between the Report and the Offering is not a fact of such prominence that it would be "absurd" to suggest that management did not know about it. Though the compliance department checks for conflicts, it does not follow that HCW's senior executives would have known about a particular conflict. *Cf. Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 & n.5 (9th Cir. 2008) (applying core operations theory because executives who were directly responsible for day-to-day operations must have known about actions that affected the "company's largest contract with one of its most important customers").[8]

### iv. The SAC's Failure-to-Correct Argument Does Not Provide a Basis for Inferring Scienter.

Finally, Panthera argues that HCW's failure to promptly correct the Report supports an inference of intentional or deliberately reckless conduct. Neither this circuit nor the Supreme Court has recognized a duty to correct, and we decline to do so in this case as well.

---

[8] Panthera asserts for the first time that the Offering was HCW's largest transaction that week, suggesting that management must have known about the conflict. But Panthera did not allege that fact in the SAC or present it to the district court, so it cannot supply a basis for inferring scienter. *See Heritage Bond*, 546 F.3d at 681 n.16.

Even without recognizing a duty to correct, however, some district courts have found that a defendant's failure to correct a false statement supports an inference of scienter. In these cases, the allegations — when considered collectively — demonstrated a deliberate intent to conceal information. *See Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC*, No. CV 15-8574 PSG (MRWx), 2018 WL 6137169 at *14–15 (C.D. Cal. Aug. 29, 2018); *Axonic Cap. LLC v. Gateway One Lending & Fin.*, No. CV 18-5127 PSG (SSx), 2019 WL 4138024 at *10–11 (C.D. Cal. May 22, 2019). In other words, where a complaint already alleges particularized facts supporting an inference of scienter, a defendant's failure to correct may tip the scale in favor of the *strong* inference required by the PSLRA.

As we discussed above, the SAC does not plead with particularity facts showing that HCW or its executives concealed information intentionally or with deliberate recklessness. Panthera's failure-to-correct argument does not provide any particularized allegations showing that any defendant acted with scienter in concealing information. Simply put, this is not a case in which HCW's failure to correct could tip the scale in favor of a strong inference of scienter.

## C. Viewing the SAC Holistically, an Inference of Fraudulent Conduct is Not as Compelling as an Inference of Non-Fraudulent Conduct.

When considering whether a complaint adequately pleads scienter, we must review all the allegations holistically. *See Tellabs*, 551 U.S. at 326. Based on our analysis above, we conclude that the SAC does not allege a strong inference of scienter. Panthera has not established that an inference of intentional or deliberately reckless conduct is as compelling as an inference of nonculpable

conduct.  *See id.* at 314.  When considering the allegations as a whole, it is more likely that HCW engaged in merely negligent conduct.

We base our conclusion on the lack of a plausible motive as well as the lack of particularized facts showing any individual's knowledge or deliberate recklessness about the Report's falsity at the time of its publication.  Given these deficiencies, the most plausible inferences are that someone failed to put MannKind on the watch list, failed to properly check the watch list, or failed to realize that a conflict existed when approving the Report.  As these innocent explanations are more plausible, we hold that the district court properly dismissed the SAC for failure to adequately plead scienter.

## III.    The District Court Properly Dismissed the Section 20(a) Claims.

Section 20(a) of the Exchange Act imposes liability on "certain 'controlling' individuals . . . for violations of section 10(b) and its underlying regulations."  *Zucco Partners*, 552 F.3d at 990.  As we have concluded that the SAC does not adequately plead a primary violation of Section 10(b) or Rule 10b-5 by any defendant, its allegations under Section 20(a) necessarily fail.

## CONCLUSION

The district court's order granting the defendants' motion to dismiss is **AFFIRMED.**